**Dock GREEN, Libellant,**

v.

**SKIBS A/S MANDEVILLE AND A. S. Klaveness & Co., A/S Managers and THE S/S KINGSVILLE, Respondents.**
**and**
**Palmetto Stevedoring Company, Inc., Respondent-Impleaded.**

**No. 1085.**

United States District Court
E. D. South Carolina,
Charleston Division.

Aug. 20, 1960.

**460**

Jacobson, Rosenblum & Spar, Charleston, S. C., Di Constanzo & Klonsky, Brooklyn, N. Y., for libelant.

Waring & Brockinton, Charleston, S. C., for respondents.

Moore & Mouzon, Charleston, S. C., for respondent-impleaded.

WYCHE, District Judge (sitting by designation).

This action came on for trial before me, sitting by designation in admiralty, on July 14, 1960. It was brought to recover damages on account of injuries suffered by Dock Green, a longshoreman, on July 26, 1956. It is not disputed that Green was injured on that date, when he jumped, or fell, from the masthouse to the main deck of the S/S Kingsville, a distance of 8 or 9 feet. Green sustained a fractured knee cap and possibly other less serious injuries, which caused him to be hospitalized and unable to work for long periods of time and from which he has sustained some degree of permanent injury to his right leg.

The S/S Kingsville, owned by Skibs A/S Mandeville and operated by A. S. Klaveness & Co., docked at the Columbus Street Terminals of the South Carolina State Ports Authority at the Port of Charleston at about 7:00 P.M. on July 26, 1956. Palmetto Stevedoring Company had been employed by the operating company to load the vessel with cargo and, immediately after it was moored, representatives of the stevedore went aboard the vessel. One gang of the longshoremen employed by Palmetto was assigned by Palmetto to load the No. 5 hatch. Cyrus Campbell was the foreman or "header" of this gang and working under him, among others, were Dock Green, Nathaniel Brown and Henry McDonald.

In order to proceed with the loading operations at the No. 5 hatch, it was first necessary for the stevedore and its employees to "rig the boom" at that hatch. The ship's officers turned over the No. 5 hatch area and its appurtenances, including winches and booms and their rigging, to the stevedore and its employees, and none of the ship's personnel took part in the loading operation or the preparations therefor. The equipment provided by the ship was of a type commonly in use and its operation was familiar to Palmetto and its employees. The type of equipment was suitable in all respects for its intended use by Palmetto.

The boom is held at the desired position by a topping-lift cable which runs from the outer end of the boom to the mast, passing through various blocks,

and then leads down the mast to wind around the topping-lift drum, located on the masthouse near the foot of the mast. The topping-lift drum is partitioned by a flange so that there can be wound around a portion of it a so-called bull cable permanently affixed to that drum. Fixed above the topping-lift drum is a heavy metal bar with pawls which, when lowered, fit into the slots of ratchets at either side of the drum and, when so fixed in these slots, locks the drum in place, thereby preventing any movement of the topping-lift cable and consequently holding the boom in fixed position. The topping-lift drum has no motive power of its own.

In order to change the position of the boom, it is necessary to lead the bull cable from the topping-lift drum to the drum of the winch, a distance of approximately 8 feet, and, by the pull of the winch drum upon the bull cable, turn the topping-lift drum sufficiently to relieve pressure on the pawls and permit the lifting of the latch bar from the ratchet of the topping-lift drum. If it is then desired to raise the boom, this is done by applying power to the winch drum so that the bull cable, by winding upon the winch drum and unwinding from the topping-lift drum, will cause the topping-lift cable to be wound around its drum. If it is desired to lower the boom, the process is reversed. When the boom is approximately vertical, the topping-lift cable will substantially fill its section of the topping-lift drum, whereas the section of that drum used by the bull cable will be substantially empty and the remaining bull cable will be either wound on the winch drum or lie loose on the deck of the masthouse. If the boom is horizontal, or below horizontal, then this situation in respect to the topping-lift drum will be the reverse.

There are two methods customarily employed by longshoremen in connection with the handling of the bull cable upon the winch drum. One method is to place a metal hook, which is attached by an eye splice to the end of the bull cable, through an eye in the flange of the winch drum, then, by the application of power to the winch, take up all of the loose bull cable upon this drum. The other method is to lead the bull cable from the topping-lift drum over to the winch drum and take several turns of the bull cable around this drum, then, holding onto the cable near the winch drum, either pay it out or take it in as the winch drum turns by application of power. The latter method is the one most frequently used by the longshoremen working for Palmetto.

A few minutes past 7:00 o'clock on the evening of July 26, 1956, Dock Green, Nathaniel Brown and Henry McDonald were ordered by their foreman to "rig the boom" at the No. 5 hatch and in order to do so went up upon the masthouse. They found that the boom was raised to a very nearly vertical position and it was necessary that it be lowered to an approximately 45-degree angle in order that it might be swung over the side of the ship to accomplish the lifting of cargo from the dock and then depositing it in the hold. McDonald was handling the controls of the electrically powered winch, Nathaniel Brown was handling the latch bar on the topping-lift drum and Dock Green was handling the bull cable upon the drum of the winch. These three longshoremen successfully lowered the boom from its nearly vertical position to approximately a 45-degree angle and then stopped its downward movement. The foreman, Campbell, then directed that the boom be somewhat further lowered and when the same three longshoremen proceeded to do so the boom fell and crashed upon the starboard bulwark. It was during the time that the boom was in the process of falling that Green either was thrown or jumped to the main deck and received his injuries.

Green alleges in his libel that his injuries resulted from the negligence of the owners of the vessel in failing to provide him with a safe place to work, in failing to maintain in proper condition the winches, cables, tackle and appurtenances and in failing to maintain the vessel in a seaworthy condition. The

462

material allegations are denied by the respondents.

After the occurrence of the accident, it was found that the bull cable had parted about eight inches from its end, just below the eye of the splice into which was placed the iron hook. There is no evidence to indicate that this cable parted before the boom fell and there is greater reason to conclude that the break occurred from undue stress placed upon the cable as the result of the hook catching in some obstruction during the course of the boom's fall. The bull cable was in good condition and, in fact, the same cable and the same iron hook, in a new eye splice, were in use on the vessel more than two years after the accident. The vessel was on its maiden voyage at the time that the accident occurred and all of its appurtenances, including the bull cable, were new. There was no showing that the cable was imperfect at the point of the break, although there were expert opinions that it would normally be expected that this would be the cable's weakest point and the place most likely to give way if submitted to undue stress. Except for the break of the bull cable and damage to the boom, all of the appurtenances of the vessel, which in any way might have played a part in the accident, were found to be in perfect condition and functioning in all respects properly to accomplish the loading of cargo at the No. 5 hatch.

When Green testified at the trial he stated that he had put the iron hook into the eye of the winch drum and that McDonald had then applied power so as to take up all of the loose bull cable upon the winch drum and thus apply motive power to the topping-lift drum. This testimony was directly contradictory to the testimony given by Green on August 20, 1958, when his deposition was taken. In his deposition, Green swore that the first thing he did was to wrap the bull cable five or six times around the winch drum, leaving a considerable amount of loose cable upon the deck, and then, as the winch drum turned, he paid out the cable by hand, during which process, for some unexplained reason, the boom fell. If the testimony of Green given in his deposition is to be believed, the section of the bull cable which broke could have played no part in causing the boom to fall, as it would have been lying upon the deck out of use.

McDonald and Brown also stated at the trial that Green had placed the iron hook affixed to the end of the bull cable in the eye of the winch drum and had then stood aside while all of the loose bull cable was wound on the winch drum by the application of power to the winch. These statements were contrary to the statements made by McDonald and Brown to the stevedore's superintendent, W. R. McPherson, Jr., when McPherson was investigating the accident within minutes after its occurrence. McPherson testified that he was on the forward part of the ship when the accident occurred, but was immediately advised of the occurrence and went to the scene; that Green was lying on the main deck and he ordered that Green be taken to the hospital; that he then asked McDonald and Brown how the accident happened and they told him that Green was "spooling the cable" when it got away from him and, by allowing the cable to run free, caused the boom to fall; and that he inspected and tested all of the equipment used in connection with rigging the starboard boom at the No. 5 hatch and found everything in proper order except that the bull cable had parted about eight inches from the hook and the boom was damaged where it struck the bulwark. McPherson explained that "spooling the cable" is an expression used by longshoremen to describe the method of handling cable on a drum by taking several turns of the cable around the drum and then paying out or taking in the loose cable by hand.

It is the theory of the libellant that the boom fell from a 45-degree angle due to the breaking of the bull cable near the hook. It is claimed by the libellant that when the boom commenced to fall, the hook at the end of the bull cable was in the eye of the winch drum, with about 5

turns of the bull cable around this drum; that Brown was holding up the latch bar of the topping-lift drum; that McDonald was operating the winch controls; and that he was standing near the winch drum but taking no part in the operation. Green said that something hit him on the head and he remembers nothing else.

While I have no doubt that Green's injuries were incident to the falling of the boom, whether he was struck by some object or jumped from the masthouse to avoid more serious injury from the threshing cable, I am not persuaded that under any theory advanced the boom was caused to fall by the parting of the bull cable. With the boom at a 45-degree angle and the hook at the end of the bull cable in the eye of the winch drum, there would be considerably more than 5 turns of the bull cable around the drum; in fact, the winch drum would have a great many turns of the bull cable upon it, as shown in a photograph identified as Libellant's Exhibit 8. With this many turns of the bull cable around the winch drum, there could be no strain upon the bull cable near the hook and, in fact, there would be no slippage of the bull cable even if the hook was not then in the eye. Under these circumstances, it would be impossible for a break near the hook to cause the cable to run from the winch drum and thereby bring about the fall of the boom. There is no question but that there was an adequate length of bull cable to allow the boom to be brought all the way down to the bulwark, upon which occasion, with the hook in the eye of the winch drum, there would remain 4 or 5 turns of the bull cable around the drum, as shown in the photograph marked Libellant's Exhibit 10.

I am convinced from all of the testimony that Dock Green was handling the bull cable upon the winch drum by the spooling method, when he permitted the cable that he was paying out to become slack, thus causing the bull cable to run free and the boom to fall. This method was selected by Green and, while not perhaps as safe as the other method which the appurtenances made available to him, was nevertheless accepted and used by longshoremen. At all the events, the testimony does not bear out the libellant's contention that before the boom commenced to fall the bull cable broke near the hook and that this caused the boom to fall.

Some mention was made that the latch on the topping-lift drum should have checked the fall after the bull cable started to run. However, this latch is not designed to do anything other than hold the topping-lift drum in a fixed position when it has been brought to a stop and does not function as a brake when the pull of the boom on the topping lift cable is causing the drum to turn rapidly. It is clear from the testimony that Brown was holding the latch up, and when he realized that the boom was falling and he finally did try to brake the rapidly moving drum, the latch was called on to perform a physical task impossible for it under the circumstances. Although some topping-lift drums are equipped with brakes, this is not in general vogue and such an appurtenance without a brake is not an unsafe or inadequate item of equipment.

 I am well aware of the well-established rule that a seaman may recover damages for the unseaworthiness of a vessel, including the insufficiency and inadequacy of appliances that are appurtenant to the ship. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern S. C. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. It is also well established that longshoremen, although intermediately employed, are, when performing the ship's service, entitled to the same protection against unseaworthiness which members of the crew doing the same work would receive. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. However, the obligation of the vessel that it be seaworthy does not permit a seaman or longshoreman to recover damages for negligence contemporaneous with the use of seaworthy appliances. Penedo Cia Naviera S. A. v. Maniatis,

464

4 Cir., 1959, 262 F.2d 284; Freitas v. Pacific-Atlantic Steamship Co., 9 Cir., 1955, 218 F.2d 562.

█ While a shipowner must furnish a seaworthy ship, he is not obligated to furnish an accident-free ship and his duty is "only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or stand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, 1960, 362 U.S. 539, 80 S.Ct. 926, 933, 4 L.Ed.2d 941.

█ From the facts developed in this case, I am convinced that the S/S Kingsville was seaworthy and its appurtenances were reasonably fit for their intended use by the stevedore and its employees in loading the vessel. It is clear to me that the accident which caused injury to the libellant was the result of negligent use of seaworthy appliances by the longshoremen, and particularly the libellant. Under these circumstances, there is no basis for the recovery of damages by the libellant against the vessel.

Upon consideration of the entire record in the cause and based upon the credible evidence presented, I find and conclude as follows:

Findings of Fact.

1. Dock Green, the libellant herein, is a resident of the City of Charleston, County of Charleston, State of South Carolina, within this district.

2. The S/S Kingsville is a cargo vessel of Norwegian registry, owned by Skibs A/S Mandeville and operated by A. S. Klaveness & Co., both companies of Oslo, Norway.

3. This Court has jurisdiction of the parties to the cause and the cause is within the admiralty and maritime jurisdiction of this Court.

4. On July 26, 1956, the S/S Kingsville docked at the Columbus Street Terminals of the South Carolina State Ports Authority at the Port of Charleston, at about 7:00 P.M.

5. Palmetto Stevedoring Company, a South Carolina corporation, contracted with the vessel, its owners and operators, to handle the loading of the vessel at the said Columbus Street Terminals and undertook, among other things, to provide all necessary stevedoring labor, including winchmen, hatch tenders, foremen and other stevedoring supervision as needed for the proper and efficient conduct of the work, and agreed, in conducting the loading, to adjust the rigging of booms and guys and remove and replace beams and hatch covers.

6. Shortly after 7:00 P.M. on July 26, 1956, the agents, representatives and employees of Palmetto Stevedoring Company boarded the vessel and the officers, agents and representatives of the vessel and its owners surrendered to the said stevedore control of those areas of the vessel where the loading operations were to be conducted, together with the appurtenances, appliances and equipment appertaining and incident thereto.

7. The equipment provided by the vessel for rigging the starboard boom at the No. 5 hatch was of a type commonly in use and its operation was familiar to Dock Green and the other longshoremen in the stevedore's gang assigned to work at the No. 5 hatch.

8. When the officers of the ship surrendered to the stevedore control of that area of the ship whereat the stevedore was to conduct loading operations at the No. 5 hatch, the said area was a safe and suitable place for the longshoremen to work in connection with the loading operations and the preparations therefor, and the appurtenances, appliances and equipment thereat were in all respects in good operating condition and adequate and fit for use in the loading operations and the preparations therefor.

9. After the stevedore assumed control of that area of the ship whereat it was to conduct loading operations at the No. 5 hatch, nothing was done by the

stevedore, or by its superintendents or foremen, or by any co-employees of Green, to render the said area an unsafe or unsuitable place for the longshoremen to work in connection with the loading operations and the preparations therefor or to cause the appurtenances, appliances and equipment thereat to be other than in good operating condition or inadequate or unfit for use in the loading operations or in the preparations therefor.

10. On July 26, 1956, Dock Green was employed by Palmetto Stevedoring Company as a longshoreman.

11. Dock Green, together with Henry McDonald and Nathaniel Brown, was ordered by the foreman of Palmetto Stevedoring Company supervising the loading of the No. 5 hatch, to rig the starboard boom at the No. 5 hatch and for that purpose went upon the masthouse.

12. When Green, McDonald and Brown were upon the masthouse, the boom was raised to a nearly vertical position, with the topping-lift cable wound upon the topping-lift drum. One end of the bull cable was affixed to the topping-lift drum with a few turns of the cable upon that drum and the remainder of the bull cable was lying loosely upon the deck. At the end of the bull cable, lying upon the deck, there was a metal hook affixed to the bull cable by an eye splice.

13. In order to make use of the boom in the loading operations, it was necessary to lower it to an approximately 45-degree angle. There was an adequate length of bull cable lying upon the deck to permit the positioning of the boom at any angle from vertical to horizontal and even as low as the level of the bulwark of the main deck.

14. Dock Green led the bull cable from the topping-lift drum over to the winch drum, a distance of approximately 8 feet, and took 5 or 6 turns of the bull cable around the winch drum and held onto the portion of the bull cable leading from the winch drum to the deck. Mc-

Donald handled the electrically powered winch controls and Brown handled the latch on the topping-lift drum.

15. By the application of power to turn the winch drum, the pull of the bull cable upon the topping-lift drum relieved the tension of the pawls upon the ratchet of the topping-lift drum and Brown raised the latch from its locked position, then held up the latch while the boom was lowered to approximately 45 degrees. During the lowering process, Green kept tension upon the bull cable at the winch drum and paid out the loose cable by hand as the winch drum turned.

16. After the downward movement of the boom was stopped at about 45 degrees, the gang foreman directed a further lowering of the boom. The further lowering was commenced by McDonald applying power to turn the winch drum, Brown holding the latch of the topping-lift drum so as to keep the pawls disengaged from the ratchet, and Green holding the bull cable to retain tension of the bull cable upon the winch drum. The failure of Green to keep and maintain sufficient tension upon the bull cable allowed the turns around the winch drum to slip, as a result of which the bull cable began to run free and out of control, whereupon Green turned loose the bull cable that he was holding and moved away from the winch.

17. After Green lost control of the bull cable, there was nothing to prevent the topping-lift cable from running free and therefore nothing to hold up the boom, which fell to the bulwark of the main deck. Meanwhile, Brown was holding up the topping-lift drum latch, but it was not until the topping-lift drum was turning at a rapid speed that he attempted to force the pawls into the ratchet, under which circumstances this could not be accomplished and he turned loose the latch and moved out of the way of the falling boom.

18. The loose bull cable, threshing around on the deck, either threw Green or caused him to jump from the masthouse to the main deck, a distance of 8 or 9

feet below. Green landed on his hands and right knee cap, causing the knee cap to be fractured.

19. An inspection of the equipment conducted immediately after the accident, revealed that the bull cable had parted at the end, which had been lying upon the deck about 8 inches from the metal hook affixed by a splice. The inspection also revealed that the boom had been damaged where it struck the bulwark of the main deck. All other appliances and appurtenances which had been in use or which were incident to the rigging of the boom at the No. 5 hatch were found to be in perfect working order and condition.

20. The bull cable was new and in good condition and fit for the purposes and uses for which it was intended. The portion of the bull cable which parted near the eye splice at its end was not in use at the time of the accident and the breaking was wholly unrelated to any circumstances which caused or contributed to the accident.

## Conclusions of Law.

1. The libellant, Dock Green, received an injury consisting of a broken knee cap on July 26, 1956, while he was employed by Palmetto Stevedoring Company as a longshoreman for the purpose, among others, of rigging the starboard boom at the No. 5 hatch of the S/S Kingsville preparatory to loading the said vessel at the Columbus Street Terminals of the South Carolina State Ports Authority at the Port of Charleston, and such injury was caused or brought about when he jumped or was thrown from the masthouse to the main deck of the said vessel as a consequence of the falling of the said boom while the same was being rigged by the libellant and others.

2. The starboard boom at the No. 5 hatch of the S/S Kingsville was caused to fall on July 26, 1956, shortly after 7:00 P.M. by reason of the negligence of the libellant, Dock Green, while rigging the boom, in that he improperly operated and handled the bull cable upon the winch drum so as to cause the same to slip and run free, thereby removing the support for the boom.

3. At the time of the aforesaid accident the S/S Kingsville was in all respects seaworthy and the appurtenances, appliances and equipment, including the cables, winches, winch drums, tackle and other appurtenances, were in good operating condition and fit for the use to which they were being put in connection with rigging the boom.

4. The area in which the libellant, Dock Green, was working, at the time of the accident which resulted in his injury, was a safe place in which to perform the work then in progress.

5. The injuries received by the libellant, Dock Green, on July 26, 1956, were due to his own fault and not to the fault of any of the respondents in this action.

6. The libellant, Dock Green, is not entitled to recover damages against any of the respondents for any cause or reason set forth in the libel in this action.

7. Since there is no basis for recovery of damages by the libellant against the respondents, there is consequently no basis for recovery over by the respondents against the respondent-impleaded.

## Decree

Consistent with the findings of fact and conclusions of law hereinabove set forth, it is therefore

Ordered, adjudged and decreed that the libel in the above entitled action be and it is hereby dismissed, and that the respondents and the respondent-impleaded have judgment against the libellant for their costs in this action.